M. G. W. KENNARD, RESPONDENT, v. WILTON McCRORY, APPELLANT.—
136 S. W. (2d) 710.

Springfield Court of Appeals.   February 15, 1940.

*Corbett & Peal* for appellant.

*Ward & Reeves* for respondent.

TATLOW, P. J.—This is a suit brought by the respondent, M. G. W. Kennard (the plaintiff below), as the landlord, against the appellant, Wilton McCrory (the defendant below), as the purchaser of three bales of cotton from Ollie Brown, respondent's tenant. Ollie Brown is not a party to the suit.

The suit was instituted by the respondent in the Circuit Court of Pemiscot County, on the 18th day of January, 1938. It seeks to recover two items, to-wit: $34.60 as rent; and $92.77 for money or supplies furnished to the tenant to enable her to raise and harvest the crop, or to subsist while carrying out her contract of tenancy. Both items are joined in the petition in one count.

The answer was a general denial.

The verdict of the jury was in favor of the respondent, for $92.17. This would indicate that the verdict was only for the money and supplies furnished to the tenant. There is a difference of 60¢ between the amount sued for under this item ($92.77) and the verdict ($92.-17). This is evidently a clerical error.

This action is based on the Act of 1925 (Laws of 1925, p. 281), which is now Section 2590, Revised Statutes, 1929. This is the only statute that deals with or authorizes a recovery against a purchaser from a tenant, for money or supplies furnished to the tenant. Prior to this act the statutes authorized a recovery for rent only, against a purchaser from a tenant.

The controlling question of fact in the instant case is whether the three bales of cotton were grown on the demised premises.

In the course of respondent's evidence, and at the close of all of the evidence in the case, the appellant requested the court to direct a verdict in his favor. This the court refused to do and its refusal is assigned as error in the case.

We will first state what we understand to be the undisputed facts in the case.

The respondent obtained a right-of-way lease from the Little River Drainage District, for the year 1937, and sublet the land to Ollie Brown. According to the government measurements, there were ten acres in the lease subject to cultivation, which, according to the respondent, should have raised ten or eleven bales of cotton. The cotton was raised between the ditches. On cross-examination, re-

spondent said that Ollie Brown's boy "was working 2 acres or approximately 2 acres that she claimed were hers" under another lease.

Respondent's witness Beulah Keith, testified that Ollie Brown had some land in cultivation that was not in the lease from Mr. Kennard. This other lease "was supposed to be hers and I think she sold it to the boy." There were "about two and one-half or three acres" in this lease.

Ollie Brown testified as a witness for the appellant:

"I let Mr. McCrory have some cotton—3 bales of it. That cotton came off my own lease and not off the Kennard place. It was off my lease on the other side of the ditch. The cotton that was raised on the Kennard place, I took it to Mr. Stillman's and Roy Hilderbrand. Mr. Kennard got the money from the Kennard lease, got it all—rent and all—and he was trying to make me pay rent on my own place that I bought on my own. On my own place I got only 3 bales of cotton and I let Mr. McCrory have that. It was raised on my own place that I bought."

On cross-examination, she testified:

"Yes, I said I had another lease out there. It was right across the Swift ditch, on this side. Yes, the ditches are pretty big but there is not as much space between them as there is in them.

. . . . . . .

". . . . No, I did not carry any cotton on Kennard's lease to McCrory's gin. I took three bales of cotton to McCrory's gin that were not extra size bales. . . . The cotton I let him (McCrory) have was not connected with Kennard at all. . . ."

The appellant testified:

". . . , I bought some cotton from Mrs. Brown, that she hauled to my gin. It was three bales, . . . One bale weighed less than a set bale, one at 530 and one at 518 amounting to 1,048. The loan value was $7.87 on the two bales, amounting to $82.47 less the picking is $59.52. The other bale burned at the gin, there was 460 pounds of that cotton burned along about that time, it wasn't link cotton, it was seed cotton. I never did weigh these bales, it was never ginned, it burned in the seed. 460 pounds is the weight of the seed cotton that burned. The quality of the seed cotton that burned was not quite as good as the other two bales. The cotton burned on 10-11-37. . . ."

He further testified:

". . . . Those two bales of cotton I mentioned are in the Government loan. I got the money on the Government loan, and applied it on Mrs. Brown's account. . . ."

Charles Cowan, a son of Mrs. Ollie Brown, testified:

". . . . I remember one bale of cotton being hauled to McCrory's gin—I helped haul it—it came off of my mother's lease, and did not come off the lease my mother had rented from Kennard. The

cotton off of the Kennard lease, some of it went to the Lake County Gin and some to Stillman's gin. I helped haul it but I don't remember how many bales we got off of that.''

On cross-examination, he testified:

''. . . On my mother's lease there was between three and three and one-half acres in cotton, . . . . I don't know how many acres was in cultivation in cotton on the Kennard lease, but I have an idea it was about nine acres, . . . . I helped haul cotton to Stillman's gin and Lake County gin, and the one load to McCrory's, that's all I hauled there. . . . . . . . I hauled one bale of it to McCrory's. I don't know exactly the size of the bale but it was 400 and something at the best I can remember. . . . I hauled one load off mother's lease and the other cotton off the Kennard lease, I hauled it to Stillman's and the Lake County Gin. . . . McCrory's gin burned over there, and our cotton was up in the gin when it burned. . . .''

Robert Cowan, another son of Mrs. Ollie Brown, testified for the appellant:

''. . . I know some more land my mother had leased over there by the Swift ditches. I helped gather the crop off my mother's lease next to the Swift ditch. The cotton that grew there she took to McCrory's, they tell me—I did not help haul all the cotton to McCrory's—me and my brother taken one load over there one evening and they could not gin it and we hauled it over to the barn and came back the next morning. That load came off my mother's lease. My brother hauled some of the other loads. I didn't help haul the cotton my mother grew on the land she rented from Kennard. No, sir, I don't know where they went to, not with all of it. On my mother's land next to the Swift ditch, she got three bales off of it that was taken to McCrory's''

Dutch Cowan, another son of Mrs. Ollie Brown, testified for the appellant:

''. . . We got that lease from Lee Hatcher—we gave him a hog for it. I cultivated that in 1937, that is I helped to do it. My cotton was over there. She never did measure—it was about three or three and one-half acres. I gave that cotton to mother and moved over to McCrory's to pick cotton in the early cotton picking season. Yes, I gave that three and one-half acres to my mother. I don't know what mother did with the cotton that I gave her, except what she said.''

Respondent, recalled, testified:

''. . . Yes, Mrs. Brown, as she said, turned over checks to me for four or five bales of cotton—Yes, she did that.''

He testified that he applied these checks on her note and mortgage, as she had told him to do.

On cross-examination, he was asked:

"Q. What become of the cotton that came off the three acres she had on the other side of the ditch that you had nothing to do with? A. I don't know.

"Q. And you don't know where that went to that went off of yours? A. I am trying to find out.

. . . . . .

"Q. Can you give us any idea how much you applied on the note and mortgage? A. Yes, sir—you mean just exactly; on the 11-12 by cotton check $20.65 was applied on the note; on the 11-13 by cotton check $14.80 was applied on the note and 11-26 by cotton check, less rent, that was made together $14.74; makes a total—I will have to add it up—$50.19."

He further testified:

". . . , when Mrs. Brown moved on this place she had some mules that I sold her on credit, I sold her everything she had on credit. Yes, she had a black horse mule named John, and a mouse colored mare mule named Kit, and two yellow jersey cows four years old. Yes, she had some red sows and a brown spotted sow and a John Deere Road Wagon, and a single harness, and a double plow harness. I sold her the cows, mules, and one set of harness. Yes, I foreclosed the mortgage and took the mules and the cows, she sent the mules over and I came and got the cows."

When recalled, he testified, on re-direct examination:

"The note you show me for $345.98 dated April 8, 1937, signed by Mrs. Ollie Brown, is the note referred to in your testimony, the chattel mortgage you show me, signed on June 5, 1937, which describes a note and also the mules, is the chattel mortgage referred to by you? Yes, sir, the credits are on the back of the note. It contains the credits to which she is entitled, on the back. The note was due October 15, 1937. Yes, later she told me to come and get the stuff, she could not pay it."

Respondent called Louis Melton, who testified that he had "heard a conversation she (Mrs. Ollie Brown) had with some other parties in which she said she was not getting along so well getting her crop settled, because the three bales she carried to McCrory from the Kennard lease, McCrory refused to settle with her or either Kennard."

G. V. Fisher testified for respondent that he "heard a conversation between Mrs. Ollie Brown and Mr. Louis Melton, in which Mrs. Brown told Mr. Melton that among other things she was not getting along so well with her crops; that McCrory had hers and Kennard's cotton tied up and would not pay either of them."

Mrs. Jewel Fisher testified on behalf of respondent that she had "heard a conversation between Ollie Brown and her (Mrs. Fisher's) father, Louis Melton, to the effect that she, Mrs. Ollie Brown, was not getting along so well because McCrory had three bales of cotton

belonging to her and Kennard and McCrory wouldn't pay either one of them for it and they came off the Kennard lease.''

Jack Genter testified for the respondent that last December he ''had a conversation with her (Mrs. Ollie Brown) over near Peach Orchard'' while he was working on the improvement of a house or barn, and she told him that McCrory had three bales of cotton that belonged to her and Kennard and wouldn't pay either of them for it.

The burden of proof was upon the respondent to show, by substantial evidence, that the three bales of cotton in question came off of the ten acres that he leased to Mrs. Ollie Brown. Looking at the evidence as a whole, there is no escape from the conclusion that the three bales of cotton in controversy could have come off of either the ten acres that respondent leased to Mrs. Ollie Brown, or the three or three and one-half acres for which her son, Dutch Cowan, gave Lee Hatcher a hog. Dutch Cowan testified that he gave his mother the cotton raised on this three or three and one-half acres. Neither is there any possible escape from the conclusion that respondent had only circumstantial evidence that the cotton came off of his lease. If the issue in the case were whether the appellant acquired the three bales of cotton from Ollie Brown, respondent's evidence would be ample to sustain a verdict that he did so acquire the cotton. In fact, the evidence is undisputed that he did. The vital and controlling issue in this case, however, is not whether he got the three bales of cotton from Ollie Brown, but whether the three bales of cotton were grown on the Kennard lease. The evidence upon which respondent relies to establish this fact, spends its entire probative force by showing that the respondent got the three bales of cotton from Ollie Brown, and not that Ollie Brown raised the cotton on the ten acres that he leased her.

Respondent sets forth, in his brief, excerpts from his testimony in the case, as follows:

'' 'Did he (appellant) tell you that he had Ollie Brown's cotton? A. Yes, I didn't at that time have anything on it, he said that Ollie Brown owed him an acount for cotton furnish bill and that his wife let her get it.

'' 'Q. You say the only contention was he said you didn't have the right to rent Mrs. Brown the Little River Land? A. That's right.

'' 'Yes, he refused to pay the rent and supply bill and told me he refused to pay Mrs. Brown. Yes, McCrory operated a gin. He ginned these three bales of cotton for Mrs. Brown, and one of the bales burned up. It was on his platform when it burned.'

''Further, on cross-examination, the plaintiff testified:

'' 'Yes, I went to see Wilton McCrory about this cotton in December, 1937. I told Wilton I had come to get the checks, the rent on the Ollie Brown land, and asked if he made it in one check or

two, and he just laughed at me and said I didn't have no rent, said I didn't have no right to rent that lease.'

"And he also testified:

"'Q. When you got over there didn't Wilton tell you to go get Mrs. Brown and if she said this cotton came off this land, rented from you he would pay you? A. I tried to get Wilton to go with me—get in my car and go with me—he wouldn't do it—he said she should have told him—he had been furnishing Ollie Brown seven years.'"

Respondent also quotes from appellant's testimony, as follows:

"I knew she was on leased land, all that Little River land is supposed to be leased, it should have been leased land. These two bales of cotton I mentioned are in the Government loan. I got the money on the Government loan, and applied it on Mrs. Brown's account. I never did pay Mr. Kennard, he never did show me that he had any interest in the cotton. No, I did not take this cotton from Mrs. Brown to my gin, I took it at my gin. Yes, and put it in the Government loan in her name. I don't know that I knew she was renting leased premises. I did know that she was out there. The supposition was that she must have been on little River land, I don't know. I don't know that she told me she was. I'm not telling the jury and never knew where it was raised. I supposed it came off the Drainage District land. Yes, I knew that this stuff was out there between the ditches, supposed to be, as far as I knew. My information is that the Little River Drainage District had control of it."

The fact remains that neither the appellant nor the respondent knew whether the cotton was raised on respondent's ten acre lease or the Lee Hatcher lease. The only persons who knew where the cotton was raised were Ollie Brown and her sons who helped her raise and pick it.

According to respondent's impeaching witnesses, Ollie Brown told them, in substance, that the cotton was raised on the Kennard lease. She testified on the trial that it was raised on the Lee Hatcher lease. Under the authorities, the impeaching evidence, at most, destroyed the probative force of her testimony. She was merely a witness in the case, and not a party to the suit, and her statements, testified to by the impeaching witnesses, would indicate that, at the time of making the statments, they were self-serving. The rule seems to be very clearly established that the impeachment of a witness only destroys the testimony, and has no probative force to establish the truth of such prior statements. [Short v. Bohle, 64 Mo. App. 242, l. c. 247; Shoninger v. Day, 53 Mo. App. 147, l. c. 150; Boatmen's Savings Bank v. Overall, 16 Mo. App. 510, l. c. 516; Kilcoyne v. Metz (Mo. App.), 258 S. W. 4, l. c. 6; Citizens Bank of Bowling Green v. Moorman, 38 Mo. App. 484, l. c. 488.]

The testimony of Ollie Brown's sons was not impeached. Hence,

if Ollie Brown's testimony is eliminated, the evidence of the sons clearly shows that the three bales of cotton in question came off of the Lee Hatcher, and not the Kennard, lease. Eliminating the testimony of her sons and considering the case solely from the respondent's evidence, it appears that Ollie Brown did have another lease upon which she raised, or could have raised, the three bales of cotton, and the burden was upon the respondent to show that the cotton was raised on his lease. The reason the appellant gave for his refusal to pay the respondent for the three bales of cotton—that respondent had no right to lease the land from the Little River Drainage District—does not tend to show where the cotton was raised. Neither does the fact that the appellant put two of the bales of cotton in a government loan, tend to show where the cotton was raised. It only shows that appellant got the two bales from Ollie Brown. The same is true with reference to the one bale that burned.

In our opinion, there is abundant evidence to show that the appellant received three bales of cotton from Ollie Brown, raised in the year 1937 on either the Kennard or the Hatcher lease; but there is no evidence except the evidence of Ollie Brown and her sons, tending to show which lease the cotton was raised on. The elimination of Ollie Brown's testimony on account of her statement to respondent's impeaching witnesses that the three bales belonged to the respondent, only destroys the probative force of her testimony. It does not show, or tend to show, whether her statement to the impeaching witnesses was true, or whether her testimony in the case was true. At most, under the authorities *supra,* it leaves the evidence just as if Ollie Brown had never made any statement and had never testified in court concerning where the cotton was raised. It leaves unimpeached the testimony of her sons that the three bales of cotton were raised on the Lee Hatcher lease. Under this state of the record it would seem that, for the purpose of weighing the circumstantial evidence offered by respondent to determine on which lease the three bales of cotton were raised, we are entitled to look to the unimpeached evidence of Ollie Brown's three sons. Furber v. Kansas City Bolt & Nut Co., 185 Mo. 301, l. c. 311, 312, where the rule is thus announced:

". . . Where the evidence of the defendant contradicts that of the plaintiff a question is presented for the jury, not for the court. Yet when the court is asked to authorize a jury to find a fact from the testimony so vague and uncertain that the inference to be drawn from it amounts to scarcely more than conjecture or the possibility that the fact might exist, then the court ought to look at the character of the evidence on the other side and if the case is such that the verdict for the plaintiff would necessarily have to be set aside, the court should not submit the question to the jury."

Applying this rule to the instant case, it is perfectly apparent that

the respondent did not make a submissible case on the question of whether the three bales of cotton were raised on his lease or on the Hatcher lease. The same inevitable conclusion must be reached if we entirely ignore the testimony of the Cowans, for the reason that the burden was upon respondent to establish that the three bales of cotton were raised on respondent's lease. Respondent's own testimony did not establish, or tend to establish the fact that Ollie Brown did not have another lease, in the year 1937, upon which she did or could have raised the three bales of cotton in controversy. The evidence of his witness, Beulah Keith, tended to show that Ollie Brown did, in fact, have such a lease.

Under the state of the record, it is our conclusion that the trial court should have directed a verdict for the defendant. It is further our conclusion that, independent of the question as to whether the three bales of cotton were or were not raised on the Kennard lease, there is an insuperable legal obstable to the submission of the case to the jury, which is that this case must, of necessity, be based upon the 1925 Act (now sections 2590 and 2591, Revised Statutes 1929). These sections were placed in the statute by a separate and independent act, complete within itself. They are the only sections which purport to give a landlord any claim for supplies against one who purchases property from his tenant.

*Section 2590* creates a lien in favor of the landlord, and provides that he "may enforce his lien against the property wherever found."

*Section 2591* provides:

"The landlord may enforce the lien given in the preceding sections by distress or attachment, in the manner provided in this chapter for the collection of rent, and subject to the same liability, and the action for money or supplies and for rent may be joined in the same action."

Observe that, under the plain terms of the statute, the lien must be enforced against the *property* either by distress or attachment. The proceeding must be *quasi in rem,* and not *in personam.* These sections create the lien and specifically provide for the remedy. They create a new and independent cause of action in derogation of the common law. They do not, as does the rent statute, purport to create a cause of action *in personam* against the purchaser from a tenant of property raised by the tenant on leased ground. So far as we can see, the statute (section 2599) authorizing an attachment for rent—and particularly the *proviso* clause thereto—has no application to the 1925 Act. The *proviso* clause in section 2599, *supra,* is as follows:

". . . : Provided, if any person shall buy any crop grown on demised premises upon which any rent is unpaid, and such purchaser has knowledge of the fact that such crop was grown on demised premises, he shall be liable in an action for the value thereof, to any

party entitled thereto, or may be subject to garnishment at law in any suit against the tenant for the recovery of the rent.''

This statute, as well as the *proviso* clause, in express terms, is limited to the amount due for rent and not for money or supplies furnished to the tenant to enable him to raise and harvest the crops, or subsist while carrying out the contracts of tenancy, as provided in the Act of 1925. The fact that the respondent might have proceeded, under the statute relating to rent, by attachment against the purchaser for the value of the property, does not give him any right to proceed against the purchaser, under sections 2590 and 2591, for moneys or supplies. This statute, by its express terms, is limited to enforcing the claim against the property itself, either by distress or attachment.

On the undisputed facts, the only two bales of cotton in existence at the time of the commencement of this suit were in the hands of the government. The other bale was destroyed by fire.

We think the applicable rule with reference to this statute is well settled in this State under the death statute. Barker v. The Hannibal & St. Joseph Ry. Co., 91 Mo. 86, l. c. 91, where the rule is thus announced:

''. . . Our statute, on this subject, both gives the right of action, and provides the remedy, for the death, where none existed at common law, and where an action is brought, under the statute, it can only be maintained subject to the limitation and conditions imposed thereby. In conferring the right of action, and in providing such remedy, in designating when, and by whom, suits may be brought, it was, as a matter of course, competent for the Legislature to provide and impose such conditions as it might deem proper, and the conditions thus imposed modify and qualify the right of recovery, or form, rather, we think, a part of the right itself, and upon which its exercise depends. . . .''

This is equally true in the instant case. The statute both gives the right of action and provides the remedy where none existed at common law, and, where an action is brought under the statute, it can *only* be maintained subject to the limitations and conditions imposed thereby.

This rule has never been departed from in this State. [Rositzky v. Rositzky, 329 Mo. 662, l. c. 670, 46 S. W. (2d) 591.] It seems to be an absolute obstacle to the respondent's right to maintain this suit in its present form, and the case is reversed and remanded with directions to dismiss respondent's case and render judgment for appellant for his costs. *Smith* and *Fulbright, JJ.*, concur.